## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS )
312 Montezuma Ave. )
Santa Fe, New Mexico 87501, )
)
DEFENDERS OF WILDLIFE )       Case No. _____
1130 17th Street N.W. )
Washington, D.C. 20036, )
)
     and )
)
SIERRA CLUB )
1650 38th Street, Suite 102W )
Boulder, Colorado 80301, )
)
     Plaintiffs, )
)
     v. )
)
U.S. BUREAU OF LAND MANAGEMENT )
1849 C Street N.W. )
Washington, D.C. 20240, )
)
     Defendant. )

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The Powder River Basin in northeastern Wyoming and southeastern Montana is

the largest coal production region in the United States.  In 2008, 42 percent of all coal mined in

the United States came from the Powder River Basin.  Since 2000, Powder River Basin coal

production has increased nearly 40 percent, from 360 million tons to a record 494 million tons

annually.  All of the ten highest-producing coal mines in the United States are located in the

Powder River Basin.

2.      Most of the coal mined from the Powder River Basin is shipped by rail and then burned in coal-fired power plants throughout the United States.  Powder River Basin coal powers hundreds of plants in 38 states from New Jersey to Oregon.  The vast majority of Powder River Basin coal is burned in the Midwest.  All of the coal mined in the Powder River Basin is owned and leased by the federal government.

3.      Carbon dioxide is one of a number of greenhouse gases that cause climate change. It comprises more than 85 percent of total greenhouse gas emissions in the United States.  Coal-fired power plants are the largest source of carbon dioxide in the country, responsible for 32 percent of all carbon dioxide emissions nationwide.

4.      As the most-productive coal mining region in the United States, the Powder River Basin is linked to more carbon dioxide emissions than almost any other region or activity.  In 2007, coal mining in the region led to the release of 795,695,068 metric tons of carbon dioxide— 13 percent of the United States' total and 40 percent of all carbon dioxide released by all coal-fired power plants in the country.

5.      In spite of the massive carbon dioxide emissions resulting from Powder River Basin coal production, Defendant U.S. Bureau of Land Management ("BLM") continues to issue new coal leases in the Basin without fully analyzing the environmental impacts—particularly climate change impacts—of increased carbon dioxide emissions resulting from this coal leasing.

6.      BLM recently authorized the sale of two large coal leases in the Powder River Basin: the Belle Ayr North and Caballo West leases.  Collectively, these two leases have the potential to produce approximately 352 million tons of coal, resulting in 644 million metric tons of carbon dioxide emissions.

7.     In preparing its Environmental Impact Statement for the two lease authorizations, BLM failed to adequately analyze the impacts of increased carbon dioxide emissions and the climate change impacts resulting from burning coal produced by the Belle Ayr North and Caballo West leases, and other past, present, and reasonably foreseeable leases in the Powder River Basin.

8.     BLM's decisions to sell and execute the Belle Ayr North and Caballo West leases also sanction activities that will result in the violation of air pollutant emission limits established under the Clean Air Act for the protection of human health and the environment.

9.     Accordingly, Plaintiffs WildEarth Guardians, Defenders of Wildlife, and the Sierra Club allege that BLM's authorization of the Belle Ayr North and Caballo West leases violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgment), and 2202 (injunctive relief).  The cause of action for Plaintiffs' claims arise under the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11.     An actual and present controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because both Defendant BLM and Plaintiff Defenders of Wildlife reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made here by BLM.

## PARTIES

13.    Plaintiff WILDEARTH GUARDIANS is a non-profit conservation organization with offices in New Mexico, Colorado, and Arizona. It brings suit on its own behalf and on behalf of its members. WildEarth Guardians ("Guardians") protects and restores the wildlife, wild places, and wild rivers of the American West. Toward this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate. Guardians has approximately 4,500 members, many of whom live, work, and/or recreate in Wyoming's Powder River Basin.

14.    Plaintiff DEFENDERS OF WILDLIFE is a national non-profit organization with over one million members and supporters nationwide. Defenders of Wildlife ("Defenders") is one of the country's leading science-based wildlife conservation organizations, and its mission includes the protection and restoration of America's native wildlife and the safeguarding of natural habitats and public lands. Defenders has worked extensively to protect wildlife, ecosystems, and aquatic resources throughout the country, including the protection of species from, the adaptation of species to, and the planning of federal and state agencies for the impacts of climate change. Defenders has approximately 856 members and 1,191 supporters in Wyoming, including members who live, work, and/or recreate in the Powder River Basin.

15.    Plaintiff SIERRA CLUB is a national nonprofit organization of approximately 625,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass climate change, air quality impacts, water quality, wildlife, and other

environmental concerns. The Sierra Club's highest national priority campaign is its "Move Beyond Coal" Campaign, which aims to transition the nation away from coal and toward clean energy solutions. The Wyoming Chapter of the Sierra Club has approximately 900 members in the state of Wyoming, many of whom live, work, and/or recreate in the Powder River Basin.

16.     Plaintiffs' members live, work, recreate, and conduct other activities on public lands, including lands affected by BLM's leasing of the Belle Ayr and Caballo West tracts. Such members are affected by poor air quality associated with existing coal leasing in the Powder River Basin, and have a substantial interest in ensuring they breathe the cleanest air possible. Plaintiffs and their members are also affected by increased greenhouse gas emissions from existing coal leasing, and have a substantial interest in ensuring that BLM fully addresses the climate change impacts from the increased emissions resulting from the Belle Ayr North and Caballo West leases. Plaintiffs and their respective members use and enjoy public lands, including lands affected by BLM's leasing of the Belle Ayr North and Caballo West leases, for recreational, scientific, aesthetic, conservation and other public purposes, and are harmed by the aesthetic and environmental impacts of coal mining there. Plaintiffs and their respective members also have a substantial interest in ensuring that BLM complies with federal law, including the requirements of NEPA and FLPMA. Plaintiffs' and their respective members' interests have been, are being, and will continue to be irreparably harmed by BLM's decision to offer the Belle Ayr North and Caballo West leases in Campbell County, Wyoming, that will further degrade the air quality in the Powder River Basin and release significant amounts of greenhouse gases contributing to global climate change.

17.     The BUREAU OF LAND MANAGEMENT ("BLM") is an agency of the United States within the Department of Interior that is directly responsible for carrying out the

Department's obligations under statutes and regulations governing coal leasing and development, including NEPA and FLPMA.

## FACTS AND LEGAL FRAMEWORK

### A.    The Powder River Basin and BLM's Coal Leasing Process.

18.    The Powder River Basin is located in northeastern Wyoming and southeastern Montana, and covers an area of roughly 24,000 square miles.

19.    Some of the largest deposits of sub-bituminous coal in the world underlie the Powder River Basin. Sub-bituminous coal is favored for electrical generation due to its low sulfur content. The Powder River Basin is the single largest source of coal in the United States. Wyoming Powder River Basin coal is shipped nationwide to 38 states. Approximately six percent of Wyoming Powder River Basin coal is burned in Wyoming.

20.    The U.S. Department of Energy ("DOE") has noted that in 2008 alone, a record 495,964,000 tons of coal were mined from the Powder River Basin, comprising 42 percent of all coal produced in the United States. More coal is mined in the Powder River Basin than in any other region of the country. DOE has also noted that in 2008, the ten highest-producing coal mines in the United States were all located in the Powder River Basin.

21.    BLM designated the Powder River Basin a "Coal Production Region" on November 9, 1979. *See* 44 Fed. Reg. 65,196 (Nov. 9, 1979).

22.    Federal regulations provide for two types of coal leasing processes: Competitive Leasing and Lease-by-Application. Competitive Leasing applies in those areas BLM has designated as Coal Production Regions. As part of this Competitive Leasing process, BLM establishes regional leasing levels that include a ceiling for coal leasing, and delineates lease boundaries based on an assessment of regional environmental impacts and public input. BLM

then auctions leases within the Coal Production Region to the highest bidder. *See* 43 C.F.R §
3420.

23.     On January 9, 1990, BLM "decertified" the Powder River Basin as a Coal
Production Region. *See* 55 Fed. Reg. 784-85 (Jan. 9, 1990). Decertification allowed BLM to
lease coal in the Powder River Basin using the streamlined Lease-by-Application process.

24.     BLM's Lease-by-Application process applies where there is an "emergency need
for unleased coal" or in areas "outside Coal Production Regions." 43 C.F.R § 3425.0-2. This
process allows coal companies, rather than BLM, to delineate lease tracts and propose them for
leasing. Lease proposals are not based on regional leasing levels or regional environmental
impact analysis. The Lease-by-Application process does not allow BLM to put a ceiling on coal
leasing. *See* 43 C.F.R § 3425.

25.     Since decertification of the Powder River Federal Coal Region in 1990, Wyoming
coal production increased from 184 million tons in 1990 to 496 million tons in 2008, an increase
of 170 percent. Wyoming coal production has increased at a more rapid rate than other domestic
coal production.

**B.     The Belle Ayr North and Caballo West Coal Leases.**

26.     BLM authorized the Belle Ayr North and Caballo West coal leases under the
Lease-by-Application process.

27.     On July 6, 2004, Alpha Coal West, Inc. ("ACW") (formerly RAG Coal West,
Inc.) filed an application with BLM for federal coal reserves in the "Belle Ayr North" tract
(WYW 161248), located in the Wyoming Powder River Basin north of and immediately adjacent
to the Belle Ayr Mine in Campbell County, Wyoming. ACW is the operator of the Belle Ayr
Mine. ACW applied to lease the Belle Ayr North tract in order to extend the life of the Belle

Ayr Mine. The Belle Ayr North tract was offered for sale on July 13, 2011, and BTU Western Resources, Inc. ("BTU") (formerly Caballo Coal Company) placed the successful bid of $210.7 million for the tract.

28.   On March 15, 2006, BTU filed an application with BLM for federal coal reserves in the "Caballo West" tract (WYW 172657) located in the Wyoming Powder River Basin west of and immediately adjacent to the Caballo Mine in Campbell County, Wyoming. BTU is the operator of the Caballo West Mine. BTU applied to lease the Caballo West tract in order to extend the life of the Caballo Mine. The Caballo West tract will be offered for sale on August 17, 2011.

29.   In 2008, the Belle Ayr Mine produced 28.7 million tons of coal. During that same year, the Caballo West Mine produced 31.2 million tons of coal. Combined, this represents more than 12 percent of the coal produced in the Wyoming Powder River Basin in 2008 and approximately 1.6 percent of nationwide estimated carbon dioxide emissions in 2008.

30.   The Belle Ayr North tract includes 1,671.03 acres and contains 221.7 million tons of mineable federal coal in Campbell County, Wyoming.

31.   The Caballo West tract includes 1,023.99 acres and contains 98.1 million tons of mineable federal coal in Campbell County, Wyoming.

32.   Mining of the Belle Ayr North and Caballo West leases will directly lead to the release of harmful air pollutants into the Powder River Basin. Furthermore, coal mined from the Belle Ayr North and Caballo West leases will be burned in coal-fired power plants across the United States. Burning this coal will release harmful air pollutants, including carbon dioxide. These increased carbon dioxide emissions will increase the rate of climate change and resulting harmful environmental impacts.

### C.      Climate Change, Carbon Dioxide, and Coal.

33.     Climate change has been intensively studied and acknowledged at the global, national, and regional scales.  The Nobel Prize-winning Intergovernmental Panel on Climate Change ("IPCC") has determined that "[w]arming of the climate system is unequivocal" and, further, that "[o]bservational evidence from all continents and most oceans shows that many natural systems are being affected by regional climate changes, particularly temperature increases."

34.     Increases in the release of greenhouse gases by human activities have intensified the greenhouse effect, leading to climate change.  According to a U.S. Global Change Research Program report entitled *Global Climate Change Impacts in the United States*:

> Observations show that warming of the climate is unequivocal.  The global warming observed over the past 50 years is due primarily to human-induced emissions of heat-trapping gases.  These emissions come mainly from the burning of fossil fuels (coal, oil, and gas) with important contributions from the clearing of forests, agricultural practices, and other activities.

35.     Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as greenhouse gases.  The U.S. Environmental Protection Agency ("EPA") most recently found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations."  74 Fed. Reg. 66,496 (Dec. 15, 2009).

36.     In Secretarial Order No. 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (Sept. 14, 2009), the Secretary of the Interior proclaimed that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands and

resources we oversee." The Secretary proceeded to call for the development of a "unified greenhouse gas emission reduction program" among Department of Interior agencies.

37.    In Executive Order No. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance* (Oct. 5, 2009), the President called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities."

38.    In the Final EIS ("FEIS") for the Belle Ayr North and Caballo West leases, BLM outlined some of the impacts of climate change to the American West, stating:

> If global warming trends continue into the foreseeable future, Chambers (2006) indicates that the following changes may be expected to occur in the West:
>
> - The amount and seasonal variability of precipitation will increase over most areas. IPCC (2001) climate model scenarios indicate that by 2100, precipitation will increase about 10 percent in summer, about 30 percent in fall, and 40 percent in winter. Less snowfall will accumulate in higher elevations, more precipitation will occur as rain, and snowmelt will occur earlier in the spring because of higher temperatures.
>
> - Streamflow patterns will change in response to reduced snowpacks and increasing precipitation. Peak flows in spring are expected to occur earlier and be of lower magnitude because of snowpack changes. Runoff from greater amounts of winter rainfall will cause higher winter flows. Summer flows will be lower, but with higher variability depending on the severity of storm events.
>
> - Some populations of native plants, invasive species, and pests will expand. Increasing amounts of atmospheric carbon dioxide and precipitation during the growing season will provide favorable growth conditions for native grasses, perennial forbs, woody species, and invasive annuals such as cheatgrass. Insect populations also will likely increase because milder winter temperatures will improve reproduction and survival rates.
>
> - Fire frequency, severity, and extent will increase because of the increased availability of fine fuels (grasses, forbs, and invasives) and accumulation of fuels from previous growing seasons. Higher temperatures will extend the length of fire seasons. Expansion of pinyon-juniper species and increasing tree densities could increase the number of high severity crown fires. Higher rates of insect damage and disease also may increase fuel accumulations.

- Sensitive species and overall biodiversity will be reduced. High-elevation habitats will shrink in area or disappear as lower-elevation plant communities expand. It is probable that some mammalian, avian, and other species that currently inhabit these high-elevation habitats may become extinct. Higher rates of disease and insect damage also may pose threats to other sensitive plant and animal species.

39.     Carbon dioxide is the leading cause of climate change and the most emitted greenhouse gas in the United States.  According to an EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2008* ("2010 GHG Inventory Report"), the U.S. emitted 7,668.43 million tons (6,956.8 million metric tons) of greenhouse gases in 2008, comprising 19 percent of human created greenhouse gases released globally.  Of this total, carbon dioxide comprises more than 85 percent of total U.S. greenhouse gas emissions, or 6,526.9 million tons (5,921.2 million metric tons).

40.     EPA also determined in the 2010 GHG Inventory Report that the electricity generation sector is the largest source of greenhouse gases in the U.S., largely due to carbon dioxide emissions.  Coal-fired power plants release more than 80 percent of all greenhouse gases from the electricity generation sector, including more than 2.17 billion tons (1.96 billion metric tons) of carbon dioxide—nearly 30 percent of the nation's total greenhouse gas inventory and 33 percent of all carbon dioxide released in the U.S., making coal the largest source of carbon dioxide in the country.

**D.     Other Air Pollutants from Coal Production—Ozone, $NO_2$, and $PM_{10}$.**

41.     Surface coal mining activities generate various air pollutants including ozone precursors, nitrogen dioxide ("$NO_2$"), and particulate matter ("$PM_{10}$").  Tailpipe emissions from mining equipment and emissions from trains used to haul coal from mines produce ozone

precursors. Blasting of mine overburden produces gaseous clouds that contain $NO_2$. Coal crushing, storing, and handling facilities are the most common sources of $PM_{10}$.

42. Ground-level ozone is a dangerous pollutant that causes a variety of significant adverse impacts to human health. According to EPA, elevated levels of ozone have a "causal relationship[] with a range of respiratory morbidity effects, including lung function decrements, increased respiratory symptoms, airway inflammation, increased airway responsiveness, and respiratory-related hospitalizations and emergency department visits." 73 Fed. Reg. 16,436, 16,443-46 (March 27, 2008). Furthermore, EPA has stated that the latest scientific evidence on ozone effects "is highly suggestive that [ozone] directly or indirectly contributes to non-accidental and cardiorespiratory-related mortality," including "premature mortality." *Id.* EPA has concluded that individuals with asthma are at particular risk from the adverse effects of ozone. *Id.*

43. Ozone is a criteria pollutant under the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.* The CAA establishes National Ambient Air Quality Standards ("NAAQS") for each criteria pollutant that represents the maximum allowable concentration of each pollutant that can occur in the air and still protect public health. *See* 42 U.S.C. § 7409. Currently, the NAAQS limit for ozone concentrations is 0.075 parts per million ("ppm") over an eight-hour period. According to EPA, an exceedance of the standard occurs whenever ambient ozone concentrations reach 0.076 ppm or higher, and a violation occurs whenever the three-year average of the fourth-highest annual eight-hour ozone concentrations is 0.076 ppm or higher.

44. $NO_2$ is a criteria pollutant under the CAA. The $NO_2$ annual standard is 53 parts per billion ("ppb"). On July 15, 2009, EPA proposed to supplement the annual standard with a one-hour $NO_2$ standard of between 80 and 100 ppb. *See* 74 Fed. Reg. 34,404-66 (July 15, 2009).

EPA stated that it was necessary to supplement the annual standard with a standard governing short-term exposure because "recent studies provide scientific evidence that is sufficient to infer a likely causal relationship between short-term $NO_2$ exposure and adverse effects on the respiratory system." *Id.* at 34,410. According to EPA, "[e]pidemiologic evidence exists for positive associations of short-term ambient $NO_2$ concentrations below the current NAAQS with increased numbers of emergency department visits and hospital admissions for respiratory causes, especially asthma." *Id.* at 34,413. EPA promulgated the final one-hour $NO_2$ standard of 100 ppb on February 9, 2010. *See* 75 Fed. Reg. 6,474-6,537 (Feb. 9, 2010).

45.     Particulate matter less than 10 microns in diameter, or $PM_{10}$, is a criteria pollutant under the CAA. *See* 71 Fed. Reg. 61,144 (Oct. 17, 2006). The NAAQS limits hourly $PM_{10}$ concentrations to 150 micrograms per cubic meter. *Id.* at 61,202. According to EPA, health effects associated with short-term exposure to $PM_{10}$ include "aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions), increased respiratory symptoms in children, and premature mortality." *Id.* at 61,178.

46.     Mining of the Belle Ayr North and Caballo West leases will lead to increased levels of harmful air pollutants—including ozone, $NO_2$, and $PM_{10}$—in the Powder River Basin.

**E.     The Belle Ayr North and Caballo West Leasing FEIS and Records of Decision.**

47.     The National Environmental Policy Act ("NEPA") was enacted to ensure that federal projects do not proceed until the environmental effects associated with those projects are completely assessed and analyzed by the proponent federal agency. *See* 42 U.S.C. § 4332(2)(C).

48.     NEPA requires the preparation of an environmental impact statement ("EIS") if a proposed federal action has the potential to "significantly affect" the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

13

49.     An EIS must, *inter alia*, analyze alternatives to the proposed action as well as the direct, indirect, and cumulative impacts associated with the proposed action. *See* 42 U.S.C. § 4332(2); 40 C.F.R. § 1508.9. The discussion of "alternatives to the proposed action" is the "heart" of the NEPA process. 42 U.S.C. § 4332(C)(iii), (E); 40 C.F.R. § 1502.14. This discussion is intended to provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.*

50.     An EIS must include a discussion of methods to mitigate adverse environmental consequences associated with the proposed action. *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h).

51.     FLPMA requires BLM to manage public lands "under principles of multiple use and sustained yield, in accordance with the land use plans" developed by BLM. 43 U.S.C. § 1732(a). Under FLPMA, BLM has the authority to regulate "the use, occupancy, and development of the public lands." 43 U.S.C. § 1732(b).

52.     Any land use authorization by BLM shall "[r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law." 43 C.F.R. § 2920.7(B)(3).

53.     In 2009, BLM issued its FEIS for South Gillette Area, including the Belle Ayr North and Caballo West Coal Lease Applications. On July 22, 2010, the BLM Wyoming State Director signed the Record of Decision ("ROD") adopting Alternative 2 for the Belly Ayr North lease, as analyzed and assessed in the FEIS. On July 28, 2010, the BLM Wyoming State Director signed the ROD adopting Alternative 2 for the Caballo West lease, as analyzed and assessed in the FEIS.

54.     The FEIS analyzed two alternatives, including the No Action alternative as Alternative 1, for the Belle Ayr North and Caballo West Tracts.  The selected alternative ("Alternative 2") would reconfigure each tract to include some or the entire tract as applied for, and may increase the size of the tract.

55.     The relevant action alternative did not analyze any alternatives with measures that would: (1) reduce, eliminate, or mitigate carbon dioxide emissions; (2) reduce, eliminate, or mitigate ozone, $NO_2$ or $PM_{10}$ emissions; or (3) reduce, eliminate, or mitigate adverse climate change impacts.  In their comments on the FEIS, Plaintiffs proposed alternatives that included such measures.

56.     Insofar as the analysis of air quality was concerned, BLM did not adequately analyze the direct, indirect, and cumulative impacts of ozone, $NO_2$, or $PM_{10}$ emissions from the Belle Ayr North and Caballo West leases to Wyoming Powder River Basin's air quality.

57.     According to EPA monitoring data, ozone levels in Campbell County, Wyoming have exceeded the ozone NAAQS on 16 occasions since 2001.  Two monitors are in operation in Campbell County, one in the Thunder Basin National Grassland and the other in southern Campbell County.  The three-year average of the fourth-highest annual eight-hour ozone readings for the years 2007-2009 is 0.065 ppm at the South Campbell County Monitor and 0.069 ppm at the Thunder Basin Monitor—that is, within 92 percent of the NAAQS.  During this same three-year period, eight-hour ozone concentrations have peaked as high as 0.088 ppm.

58.     BLM's air quality analysis in the FEIS did not estimate ozone emissions from the Belle Ayr North and Caballo West leases and did not analyze air quality impacts from ozone emissions.  In its FEIS, BLM stated that "[ozone] has been included in discussions on emissions of nitrogen oxide ($NO_x$) since $NO_x$ is one of the main ingredients involved in the formation of

ground level [ozone]." BLM mentioned ozone only briefly in the context of a discussion of NOx emissions in the FEIS by stating that $NO_x$ "is one of the main ingredients involved in the formation of ground level ozone." BLM provides no information on projected ozone levels from lease development. BLM also provides no analysis of air quality impacts from increased ozone emissions resulting from lease development.

59. BLM's air quality analysis in the FEIS did not analyze $NO_2$ emissions from the Belle Ayr North and Caballo West leases on an hourly basis. In the FEIS, BLM claimed that "[n]either the EPA nor the [Wyoming Department of Environmental Quality] have established NAAQS for $NO_2$ for averaging times shorter than one year." Prior to BLM's approval of the ROD, EPA supplemented the annual $NO_2$ standard with a one-hour NAAQS for $NO_2$ to protect public health from short-term $NO_2$ exposure.

60. In the FEIS, BLM recognized that "$NO_2$ is by far the most toxic of several species of $NO_x$." BLM further noted that $NO_2$ "may cause significant toxicity because of its ability to form nitric acid with water in the eye, lung mucous membranes, and skin," "may cause death by damaging the pulmonary systems," and "may exacerbate pre-existing respiratory conditions, or increase the incidence of respiratory infections."

61. In analyzing the $PM_{10}$ impacts of the Belle Ayr North and Caballo West leases, BLM concluded that the Belle Ayr North and Caballo West leases would comply with the 24-hour $PM_{10}$ NAAQS. This conclusion is not supported by $PM_{10}$ monitoring data presented in the FEIS for the region around the existing Belle Ayr and Caballo Mines. These data show 29 monitored exceedances of the 24-hour $PM_{10}$ standard at seven operating mines in the Wyoming Powder River Basin between 2001 and 2006. In 2007, six exceedances occurred at three mines. BLM also disclosed in the FEIS that the cumulative impacts of the Belle Ayr North and Caballo

West leases would lead to future exceedances of the 24-hour $PM_{10}$ NAAQS, with concentrations as high as 512.8 micrograms/cubic meter, even under a low production scenario.

62.     In analyzing and approving the Belle Ayr North and Caballo West leases, BLM did not analyze how and to what degree increased carbon dioxide emissions from leasing activities would contribute to climate change. BLM did not analyze and assess such impacts resulting from the Belle Ayr North and Caballo West leases or their magnitude of contribution to climate change. BLM also did not consider measures to reduce, eliminate, or mitigate carbon dioxide emissions occurring as a consequence of the agency's decision to offer the Belle Ayr North and Caballo West leases.

### F.     Procedural History.

63.     On December 23, 2008, Defenders of Wildlife submitted timely Comments on the South Gillette draft EIS ("DEIS").

64.     On December 24, 2008, WildEarth Guardians submitted timely Comments on the South Gillette DEIS.

65.     On September 21, 2009, WildEarth Guardians and the Sierra Club submitted timely joint Comments on the South Gillette FEIS.

66.     On August 30, 2010, Plaintiffs filed a timely Notice of Appeal and Petition for Stay with the Interior Board of Land Appeals ("IBLA") over BLM's issuance of the RODs adopting Alternative 2 and authorizing for sale the Belle Ayr North and Caballo West leases.

67.     On October 28, 2010, the IBLA denied Plaintiffs' Petition for Stay of the RODs, thereby making BLM's decisions to offer the Belle Ayr North and Caballo West leases effective, final, and subject to judicial review. See 43 C.F.R. §§ 4.21(a)(3), (b)(4), (c).

68.     On June 27, 2011, Plaintiffs filed a motion to voluntarily dismiss their Appeal in order to challenge BLM's leasing authorizations in federal court.  On August 9, 2011, the IBLA filed an order granting this dismissal.

69.     On July 12, WildEarth Guardians sent BLM a notice of its intent to file suit over BLM's authorizations of the Belle Ayr North and Caballo West leases.

70.     On July 13, 2011, BLM held the sale for the Belle Ayr North coal lease, in which BTU was the successful bidder.  On August 17, 2011, BLM will hold the sale for the Caballo West coal lease.

## CLAIMS FOR RELIEF

### First Claim for Relief:
### Violation of NEPA – FEIS Is Legally Inadequate
### (Failure to Take a Hard Look at Impacts to the Environment and Reasonable Alternatives)

71.     Plaintiffs incorporate by reference all preceding paragraphs.

72.     NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions.  42 U.S.C. § 4332.  NEPA's implementing regulations require BLM to consider and assess the direct and indirect impacts of mining and burning coal from the Belle Ayr North and Caballo West leases, as well as the cumulative environmental impacts of mining and burning coal from the Belle Ayr North and Caballo West leases when added to other past, present, and reasonably foreseeable future actions, including cumulative and similar actions. *See* 40 C.F.R. §§ 1508.25(a)(2),(3), 1508.25(c)(3), 1508.7.

73.     NEPA and its implementing regulations also require BLM to include in EISs "reasonable alternatives" to a proposed action that will avoid or minimize the action's adverse effects on the quality of the human environment.  42 U.S.C. § 4222(C)(iii), (E); 40 C.F.R. §§ 1500.2(e), 1502.14, 1508.9(b).

18

74.     Additionally, NEPA's implementing regulations require that an EIS discuss means to mitigate adverse environmental consequences. Mitigation includes, but is not limited to, avoiding, minimizing, rectifying, or compensating for adverse project impacts to the environment. *See* 40 C.F.R. § 1508.20.

75.     The FEIS is legally inadequate because BLM failed to analyze the indirect effects of carbon dioxide emissions resulting from the Belle Ayr North and Caballo West leases. Such impacts are indirect in that they "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Combustion of coal is a logical consequence of offering the Belle Ayr North and Caballo West leases.

76.     The FEIS is legally inadequate because BLM failed to analyze the cumulative impacts of carbon dioxide emissions from all past, present, and reasonably foreseeable coal leasing and development, and other activities and development, in the Powder River Basin.

77.     The FEIS is legally inadequate because BLM failed to analyze how the direct, indirect, and cumulative greenhouse gas emissions associated with the Belle Ayr North and Caballo West leases will influence climate change. In the ROD, BLM assumed that the release of greenhouse gases associated with the Belle Ayr North and Caballo West leases will contribute to climate change. Despite this assumption, BLM made no attempt to analyze and assess such impacts or the magnitude of contribution to climate change.

78.     BLM also failed to analyze any mitigation measures that would reduce or eliminate carbon dioxide emissions and subsequent climate change impacts associated with these emissions.

79.     The FEIS is legally inadequate because BLM failed to adequately analyze the direct, indirect, and cumulative impacts to air quality resulting from ozone, $NO_2$, and $PM_{10}$

emissions from coal mining activities on the leases. BLM also failed to analyze any mitigation measures that would reduce or eliminate ozone, $NO_2$, and $PM_{10}$ emissions.

80. BLM also failed to analyze any reasonable alternative that would prevent or minimize carbon dioxide emissions and address subsequent climate change impacts resulting from these emissions. In their DEIS comments, Plaintiffs proposed several reasonable alternatives for reducing carbon dioxide emissions including requiring capture and use of methane vented from coal mining activities; requiring more efficient mining equipment, such as mine hauling trucks; requiring the mine operator to secure carbon offsets before commencing coal mining activities; limiting annual coal production to reduce greenhouse gases from coal combustion; and alternatives that factor in the cost of greenhouse gas emissions and climate change when determining the fair market value of the coal to be leased.

81. BLM failed to analyze any reasonable alternative that would prevent or minimize further degradation to Powder River Basin air quality from ozone, $NO_2$, and $PM_{10}$ emissions.

82. BLM approved and adopted Alternative 2 on the basis of a legally inadequate FEIS that failed to provide an adequate analysis of (1) air quality, carbon dioxide, and climate change impacts, (2) a reasonable range of alternatives, and (3) reasonable mitigation measures, and was therefore arbitrary and capricious and in violation of NEPA. *See* 5 U.S.C. §§ 702-706.

**Second Claim for Relief:**
**Violation of FLPMA – Failure to Comply With Air Quality Standards**

83. Plaintiffs incorporate by reference all the preceding paragraphs.

84. FLPMA provides that BLM's land use plans must "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8).

85.    BLM's applicable land use plan—the Buffalo Resource Management Plan

("RMP")—explicitly provides for such compliance.  The Buffalo RMP states that BLM will

"minimize emissions that could result in acid rain, violations of air quality standards, or reduced

visibility," and that the agency will ensure its decisions are "conditioned to avoid violating

Wyoming and national air quality standards."

86.    FLPMA and BLM's regulations prohibit agency action that is inconsistent with

the land use plan.  *See* 43 U.S.C. § 1732(a) (mandating that the Secretary "shall manage the

public lands … in accordance with the land use plans"); *see also* 43 C.F.R. § 1610.5-3(a)

("resource management authorizations and actions" must conform to the applicable resource

management plan).

87.    FLPMA's implementing regulations require that each land use authorization made

by BLM shall require compliance with federal air quality standards established pursuant to

applicable federal law.  *See* 43 C.F.R. § 2920.7(b)(3).

88.    The NAAQS for ozone, $NO_2$, and $PM_{10}$ are federal air quality standards

designated pursuant to 42 U.S.C. § 7408.

89.    Although the air quality monitors in the region have detected numerous

exceedances of the ozone NAAQS, BLM did not even attempt to analyze the impacts of the

Belle Ayr North and Caballo West lease emissions to air quality.  Therefore, there is no evidence

that BLM complied with FLPMA's substantive air quality standard protection requirements in

authorizing the Belle Ayr North and Caballo West leases for sale.

90.    BLM did not analyze the impacts of the Belle Ayr North and Caballo West leases

to the recently adopted hourly $NO_2$ NAAQS.  Therefore, there is no evidence that BLM

complied with FLPMA's substantive air quality standard protection requirements in authorizing the Belle Ayr North and Caballo West leases for sale.

91.     BLM's own FEIS shows that on a cumulative basis, the Belle Ayr North and Caballo West leases will exceed various $PM_{10}$ standards and that numerous exceedances of the 24-hour $PM_{10}$ NAAQS have been recorded in recent years within the Powder River Basin. BLM does not deny that exceedances of the 24-hour $PM_{10}$ NAAQS have been recorded, or that the FEIS projects exceedances of the NAAQS. Rather, the BLM asserts that it simply has no authority to address these impacts. Such an assertion conflicts with FLPMA's requirement that the Agency's actions "provide for compliance with…Federal air…standards[.]" 43 U.S.C. § 1712(c)(8). The governing RMPs explicitly echo this requirement, stating that BLM shall both comply with Federal air quality standards and minimize emissions.

92.     BLM's failure to provide for compliance with federal air quality standards for ozone, $NO_2$, and $PM_{10}$ prior to authorizing the sale of the Belle Ayr North and Caballo West leases violates FLPMA and its implementing regulations, and is arbitrary, capricious, and contrary to law. *See* 5 U.S.C. §§ 702-706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that BLM's actions are in violation of NEPA and FLPMA, and their implementing regulations, as set forth above;

B.     Adjudge and declare that BLM's FEIS and RODs are arbitrary and capricious and contrary to law, vacate said FEIS and RODs as invalid, and vacate any lease sales, issuances, or other actions conducted under and/or pursuant to the FEIS and RODs;

C.     Enjoin any further BLM approvals or actions with respect to the Belle Ayr North and Caballo West lease parcels, and any coal mining activities on the Belle Ayr North and Caballo West lease parcels until such a time as BLM has complied with NEPA and FLPMA and adequately analyzed the direct, indirect, and cumulative impacts of its leasing decision;

D.     Enter such temporary, preliminary, or permanent injunctive relief as specifically prayed for by Plaintiffs hereinafter;

E.     Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

F.     Grant such additional and further relief as the Court may deem just and appropriate.

Respectfully submitted on this 16th day of August 2011.

_for_ Samantha Ruscavage-Barz (Bar No. CO0053)
WildEarth Guardians
312 Montezuma Ave.
Santa Fe, New Mexico 87501
(505) 988-9126 x.1158 (office)
(505) 989-8623 (fax)
sruscavagebarz@wildearthguardians.org

Adam Kron (Bar No. 992135)
Defenders of Wildlife
1130 17th Street N.W.
Washington, D.C. 20036
(202) 772-3224 (office)
(202) 682-1331 (fax)
akron@defenders.org

_for_ James J. Tutchton (Bar No. CO0054)
WildEarth Guardians
6439 E. Maplewood Ave.
Centennial, Colorado 80111
(720) 301-3843 (office)
jtutchton@wildearthguardians.org

_Attorneys for Plaintiffs_