**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WILDEARTH GUARDIANS et al.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Case No. 1:11-cv-1481 (RJL)** |
| ) | |
| **BUREAU OF LAND MANAGEMENT,** ) | |
| ) | |
| **Federal Defendant** ) | |
| ) | |
| ———————————————— ) | |
| ) | **FILED** |
| **STATE OF WYOMING, et al.,** ) | |
| ) | MAR 3 1 2014 |
| **Defendant-Intervenors** ) | Clerk, U.S. District & Bankruptcy |
| | Courts for the District of Columbia |

## MEMORANDUM OPINION

March 30, 2014 [## 38, 41, 43]

Plaintiffs WildEarth Guardians, Defenders of Wildlife, and the Sierra Club

(collectively, "plaintiffs") brought suit against defendant United States Bureau of Land

Management ("BLM") in connection with BLM's decision to lease two coal tracts in

Wyoming's Powder River Basin ("PRB")—the Belle Ayr North ("BAN") and Caballo

West ("CW") tracts.[1]  Plaintiffs claim that BLM violated the National Environmental

Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4335, and the Federal Land Policy

Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1784, because the agency failed to

---

[1] Following initiation of this action, the state of Wyoming, Alpha Wyoming Land Company, LLC, and Peabody Energy Company intervened as party defendants (collectively, "defendant-intervenors").

adequately consider the impacts on air quality and climate change resulting from the two leases before deciding to authorize those leases. Before the Court are plaintiffs' Motion for Summary Judgment, defendant's Cross-Motion for Summary Judgment, and defendant-intervenors' Cross-Motion for Summary Judgment.[2] Upon consideration of the pleadings, record, and relevant law, plaintiffs' motion is DENIED, defendant's motion is GRANTED, and defendant-intervenors' motion is GRANTED.

## BACKGROUND

### I.    Statutory and Regulatory Framework

This case concerns the leasing of public lands for coal mining. The Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq.*, authorizes the Secretary of the Interior to lease publicly-owned lands for coal mining through a competitive bidding process. 30 U.S.C. § 201(a)(1). Pursuant to the MLA's implementing regulations, BLM may conduct competitive lease sales under one of two processes—competitive leasing based on regional leasing levels, or leasing-by-application ("LBA"). *See* 43 C.F.R. pt. 3420. Under the LBA process, which was used in the instant case, an applicant identifies and proposes specific tracts of public land for leasing. *See* 43 C.F.R. subpt. 3425.

---

[2] *See* Pls.' Mot. for Summ. J. and Mem. of P. & A. in Supp. [Dkt. # 38] ("Pls.' Mem."); Federal Def.'s Cross-Mot. for Summ. J. and Combined Mem. of Law in Supp. [Dkt. # 43] ("Def.'s Mem."); Def.-Intervenors' Cross-Mot. for Summ. J. and Mem. of P. & A. in Supp. [Dkt. # 41] ("Def.-Intervenors' Mem."); *see also* Reply in Supp. of Pls.' Mot. for Summ. J. and Response in Opp'n to Def.'s and Intervenors' Cross-Mots. for Summ. J. [Dkt. # 48] ("Pls.' Reply"); Federal Def.'s Reply Brief in Supp. of its Cross-Mot. for Summ. J. [Dkt. # 52] ("Def.'s Reply"); Def.-Intervenors' Reply Mem. in Supp. of their Cross-Mot. for Summ. J. [Dkt. # 51] ("Def.-Intervenors' Reply").

Before acting on a lease application, BLM must conduct an environmental review pursuant to NEPA. Under NEPA, all federal agencies are required to prepare an Environmental Impact Statement ("EIS") for any proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3; *see also Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002). NEPA's requirement to prepare an EIS serves two purposes: it ensures that the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts" before making a decision on the proposed action, and it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The EIS must analyze the direct, indirect, and cumulative impacts of the proposed action on the environment, 40 C.F.R. §§ 1502.16, 1508.7, as well as "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii). To satisfy NEPA, the agency must take a "hard look" at the environmental consequences of a proposed action before proceeding, but the statute does "not require agencies to elevate environmental concerns over other appropriate considerations." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). NEPA thus mandates a process, not a particular substantive result. *See Robertson*, 490 U.S. at 350.

BLM is also subject to the statutory regime of FLPMA. Under that statute, BLM is responsible for managing the public lands. 43 U.S.C. § 1732. For a given area, BLM first develops a "land use plan," or Resource Management Plan ("RMP"), which sets

forth objectives for managing resources on those lands. *Id.* § 1712(a); Def.'s Mem. at 4.

BLM's land use planning must "observe the principles of multiple use and sustained

yield." 43 U.S.C. § 1712(c)(1); *see also id.* § 1732(a). Multiple use means "the

management of the public lands and their various resource values so that they are utilized

in the combination that will best meet the present and future needs of the American

people," and "a combination of balanced and diverse resource uses that takes into account

the long-term needs of future generations for renewable and nonrenewable resources,

including, but not limited to, recreation, . . . minerals, . . . and natural scenic, scientific

and historical values . . ." *Id.* § 1702(c). Sustained yield means "achievement and

maintenance in perpetuity of a high-level annual or regular periodic output of the various

renewable resources of the public lands consistent with multiple use." *Id.* § 1702(h).

Further, BLM's land use plans must "provide for compliance with applicable pollution

control laws, including State and Federal air, water, noise, or other pollution standards or

implementation plans." *Id.* § 1712(c)(8). Specific resource management actions by

BLM, such as leasing the coal tracts at issue in this case, must conform to the applicable

RMP. 43 C.F.R. § 1610.5-3(a).

## II. Factual and Procedural Background

The Powder River Basin ("PRB"), located in Wyoming and Montana, is the single

largest source of coal in the United States, *see* Administrative Record ("AR") 9378,

11148, and over 90 percent of its coal deposits are owned by the federal government, AR

9389. Plaintiffs WildEarth Guardians, Defenders of Wildlife, and the Sierra Club, are

4

non-profit conservation organizations with members located across the nation, including members who live, work, and recreate in the PRB. Compl. [Dkt. # 1] ¶¶ 13-15.

In 2004 and 2006, coal mining companies operating existing mines in the PRB applied to defendant BLM under the LBA regulations to lease the two coal tracts at issue in this case—the Belle Ayr North ("BAN") and Caballo West ("CW") tracts. On July 6, 2004, RAG Coal West, Inc. (predecessor to defendant-intervenor Alpha Wyoming Land Company, LLC) filed an application to lease the BAN tract, which includes an estimated 221.7 million tons of minable coal. AR 3, 14. On March 15, 2006, Caballo Coal Company (predecessor to BTU Western Resources, Inc., which in turn is predecessor to defendant-intervenor Peabody Energy Company) applied to lease the CW tract, which includes an estimated 130.2 million tons of minable coal. AR 49, 58.

Pursuant to its obligations under NEPA, BLM published in the Federal Register a notice of its intent to prepare an EIS analyzing four proposed coal leases in the South Gillette area, including the BAN and CW tracts. *See* 72 Fed. Reg. 14,828 (Mar. 29, 2007). After publishing a draft EIS in October 2008 and accepting public comments, BLM prepared a final EIS ("FEIS") in August 2009 that spanned more than 600 pages. AR 3386, 2299-2489; *see also* 74 Fed. Reg. 41,430 (Aug. 17, 2009). The FEIS analyzed three alternatives for the BAN and CW tracts: (1) competitive lease sales of the two tracts as applied for; (2) a No Action alternative, in which the two tracts would not be leased ("Alternative 1"); and (3) competitive lease sales of the two tracts as reconfigured by BLM ("Alternative 2"). AR 1489-97; Compl. ¶¶ 53-54. Plaintiffs submitted comments on both the draft EIS and the FEIS, and proposed alternative measures that would

5

"reduce, eliminate, or mitigate" carbon dioxide ("$CO_2$"), ozone, nitrogen dioxide ("$NO_2$"), and particulate matter ("$PM_{10}$") emissions, as well as adverse climate change impacts, from the proposed leases. Pls.' Mem. at 5; Compl. ¶ 55; AR 4035-53, 4125-27, 4111-20, 4245-67.

In July 2010, BLM approved two Records of Decision ("ROD") authorizing competitive lease sales for the BAN and CW tracts. *See* Compl. ¶ 53; Pls.' Mem. at 5; Def.'s Mem. at 1. Plaintiffs filed an administrative Notice of Appeal and Petition for Stay with the Interior Board of Land Appeals ("IBLA") in August 2010, challenging both RODs. AR 10770-10835. The IBLA denied the Petition for Stay in October 2010. AR 11718-25. Before it could rule on the merits of plaintiffs' challenge, however, plaintiffs moved to voluntarily dismiss their appeals in June 2011, and the IBLA granted that request in August 2011. AR 11775-76, 11778-80. Meanwhile, BLM offered the BAN tract for sale on July 13, 2011, and BTU Western Resources, Inc. placed the winning bid. Compl. ¶ 27; Def.'s Mem. at 8. BLM then offered the CW tract for sale on August 17, 2011, and Alpha Wyoming Land Company, LLC won the bid. Def.'s Mem. at 8-9.

Plaintiffs filed a complaint in this Court on August 16, 2011, bringing one count under NEPA and one count under FLPMA. Plaintiffs, who allege that their members have recreational, aesthetic, and economic interests in the public lands of the PRB, Compl. ¶¶ 13-15, claim that BLM violated NEPA by authorizing the leases of the BAN and CW tracts without adequately considering the decisions' impacts on air quality and climate change, Compl. ¶¶ 71-82. Specifically, plaintiffs claim that BLM's FEIS was legally inadequate because it failed to analyze the direct, indirect, and cumulative impacts

on air quality of ozone, $PM_{10}$, and $NO_2$ emissions resulting from coal mining on the lease

tracts, Compl. ¶ 79, [3] as well as the direct, indirect, and cumulative effects on climate

change of greenhouse gas ("GHG") emissions, including $CO_2$, resulting from lease

development, Compl. ¶¶ 75-77. Plaintiffs also allege that BLM failed to sufficiently

consider mitigation measures and reasonable alternatives to minimize emissions. Compl.

¶¶ 78, 80-81. Finally, under FLPMA, plaintiffs claim that BLM's authorization of the

leases failed to comply with federal air quality standards. Compl. ¶¶ 83-92. Plaintiffs

therefore seek declaratory and injunctive relief, including vacatur of the FEIS and the two

RODs authorizing the leases. Compl. at 22-23.

## STANDARD OF REVIEW

Challenges to agency action are reviewed under the Administrative Procedure Act

("APA"), 5 U.S.C. § 551 *et seq.* Under the APA, a court must set aside agency action if

it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential and presumes

the validity of agency action." *Neighborhood Assistance Corp. of Am. v. CFPB*, 907 F.

Supp. 2d 112, 125 (D.D.C. 2012) (citing *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C.

Cir. 2000)) (internal quotation marks omitted)). The court may not "substitute its

judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court will only set aside

---

[3] Based on Judge Kollar-Kotelly's ruling on a similar challenge in *WildEarth Guardians v. Salazar* ("*West Antelope I*"), 880 F. Supp. 2d 77, 90-91 (D.D.C. 2012), plaintiffs do not pursue the allegation in their complaint that BLM failed to adequately analyze the impacts to air quality of $NO_2$ emissions from the leases. *See* Pls.' Mem. at 2 n.1.

agency action as arbitrary and capricious if the agency committed a "clear error of judgment," such as when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* So long as the agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," its action will be upheld. *Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1476 (D.C. Cir. 1998) (internal quotations, citations, and modifications omitted).[4]

## ANALYSIS

In *WildEarth Guardians v. Salazar* ("*West Antelope I*"), 880 F. Supp. 2d 77 (D.D.C. 2012), my colleague, Judge Kollar-Kotelly, considered a nearly identical challenge by these same plaintiffs[5] to BLM's decision to lease two different coal tracts also located in Wyoming's PRB. Judge Kollar-Kotelly granted summary judgment in favor of the government defendants, and recently—while the parties' cross-motions for summary judgment were pending in the instant action—our Circuit Court affirmed that

---

[4] When reviewing final agency action under the APA, the summary judgment standard of Fed. R. Civ. P. 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Citizens for Responsibility and Ethics in Washington v. SEC*, 916 F. Supp. 2d 141, 144 (D.D.C. 2013). The district court "determine[s] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* at 145 (internal quotation marks and citation omitted).

[5] In *West Antelope I*, the plaintiffs were the three conservation organization plaintiffs in the instant action, as well as the Powder River Basin Resource Council following consolidation of two suits.

8

decision. *WildEarth Guardians v. Jewell* ("*West Antelope II*"), 738 F.3d 298 (D.C. Cir. 2013). In view of the similarities, both factual and legal, between that case and this one, our Circuit Court's *West Antelope II* opinion provides instructive analysis—and, regarding certain issues, binding authority—that help guide my decision here.

The gravamen of the plaintiffs' complaint in each case is that BLM failed to adequately address impacts to air quality and climate change resulting from the respective coal leases, in violation of NEPA and FLPMA. Here, as in *West Antelope I*, the parties dispute plaintiffs' standing to raise certain of their challenges to the sufficiency of the FEIS. Accordingly, I will first address plaintiffs' standing, and for the reasons explained below I find that they have standing to raise *all* of their challenges to the FEIS. Next, turning to the merits, I conclude that BLM complied with NEPA and FLPMA when preparing the FEIS and authorizing the two leases.

## I.    Standing

The Constitution limits the role of federal courts to resolving cases and controversies. U.S. Const. art. III, § 2; *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009). Accordingly, plaintiffs must show they have standing to bring their claims as a "predicate to any exercise of [this Court's] jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996). In order to satisfy the "irreducible constitutional minimum" of Article III standing, plaintiffs must satisfy three requirements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a
> legally protected interest which is (a) concrete and particularized, and (b)
> actual or imminent, not conjectural or hypothetical. Second, there must be

a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*United States v. Windsor*, 133 S. Ct. 2675, 2685-86 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations, citations, and modifications omitted)). As the party invoking federal jurisdiction, plaintiffs "bear[] the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (citing, *inter alia*, *Lujan*, 504 U.S. at 561). And for purposes of considering whether plaintiffs have Article III standing, this Court "must assume *arguendo* the merits of [their] legal claim[s]." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007); *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012).

In this case, plaintiffs allege a procedural (rather than substantive) injury.[6] In fact, their complaint sets out the "archetypal procedural injury" in arguing that BLM failed to take a "hard look" at the environmental impacts of the leases and prepare a legally adequate EIS under NEPA. *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) ("The hypothetical in footnote 7 of *Lujan* represents the archetypal

---

[6] Plaintiffs are non-profit conservation organizations with members located in the PRB and across the nation. Compl. ¶¶ 13-15. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). None of the parties dispute the latter two elements of associational standing; the only issue is whether the members of WildEarth Guardians, Defenders of Wildlife, and the Sierra Club would otherwise have standing to raise all of the legal claims alleged in plaintiffs' complaint.

procedural injury: an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment."); Pls.' Mem. at 8. When conducting a standing inquiry for a plaintiff claiming a procedural injury, "the courts relax—while not wholly eliminating—the issues of imminence and redressability[.]" *Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005); *see also Lujan*, 504 U.S. at 572 n.7.[7] That is, plaintiffs here need not show that the alleged environmental harms resulting from BLM's authorization of the leases are imminent, or about to occur. *See id.* Nor need they show that the preparation of an adequate EIS will necessarily protect their rights. *See NB ex rel. Peacock*, 682 F.3d at 86 ("[A] 'plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.'" (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002))).

On the other hand, however, the injury in fact and causation requirements of standing are *not* similarly relaxed in the procedural injury context. *See Ctr. for Law and Educ.*, 396 F.3d at 1157; *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) ("the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute"); *Fla. Audubon Soc'y*, 94 F.3d at 669 (requiring showing of causation "ensure[s] that NEPA cannot foster a procedural right 'in the air'"; failing to

---

[7] "[O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan*, 504 U.S. at 572 n.7.

"require that a[n] [EIS] plaintiff show that its particularized injury resulted from the government action at issue would effectively void the particularized injury requirement"). Accordingly, to establish standing, plaintiffs here must show that they have a concrete interest that is affected by the alleged procedural deprivation. *See Fla. Audubon Soc'y*, 94 F.3d at 664-65; *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").[8]

In this case, as in *West Antelope I*, plaintiffs allege that the FEIS failed to adequately consider two categories of environmental impacts: (1) impacts to local air quality in the PRB area resulting from coal mining activity on the BAN and CW lease tracts, and (2) impacts on climate change of GHG emissions resulting from both coal mining operations on the lease tracts and the subsequent burning of that mined coal to generate electricity. Pls.' Mem. at 22, 30; *see West Antelope I*, 880 F. Supp. 2d at 83. And plaintiffs argue that they have standing to challenge the sufficiency of the FEIS's consideration of *both* categories of impacts. While much ink has been spilled by the parties on the extent of plaintiffs' standing, our Circuit Court's decision in *West Antelope II* squarely controls this issue and dictates that plaintiffs here do, in fact, have standing to argue that the FEIS failed to adequately address both categories of impacts.

---

[8] A plaintiff may bring a procedural injury claim pursuant to a "citizen suit" provision in the applicable statute. *See, e.g., Lujan*, 504 U.S. at 571-72. In cases involving statutes without such provisions, however—such as NEPA—a plaintiff may bring a claim under the APA instead, as plaintiffs do here. *See Fla. Audubon Soc'y*, 94 F.3d at 665.

### A. Plaintiffs Have Standing to Challenge Impacts of BLM's Leasing Decision on Local Air Quality

Plaintiffs first allege that BLM's FEIS failed to adequately address the impacts of the leasing decisions on local air quality. To establish standing to raise this claim, plaintiffs allege that BLM's authorization of the BAN and CW leases will cause harm to the aesthetic and recreational interests of their members in the PRB area as a result of impacts to air quality from coal mining on the lease tracts. Compl. ¶¶ 16, 79. I agree—and neither defendant nor defendant-intervenors dispute—that plaintiffs have standing on this ground, *see* Def.'s Mem. at 10; Def.-Intervenors' Mem. at 10, and our Circuit Court's analysis in *West Antelope II* confirms this conclusion.

First, plaintiffs have shown injury in fact because their alleged procedural injury—the allegedly deficient FEIS—is tied to their members' concrete aesthetic and recreational interests. *See West Antelope II*, 738 F.3d at 305. Environmental interests, such as the aesthetic and recreational interests of people who use the areas in question, are cognizable interests for standing purposes, and damage to them can constitute injury in fact. *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity" (internal quotation marks and citation omitted)). Here, coal mining activity on the two lease tracts will generate ozone precursors and $PM_{10}$, and ozone and $PM_{10}$ are air pollutants regulated under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*,

through applicable National Ambient Air Quality Standards ("NAAQS"). Compl. ¶¶ 41-46; Pls.' Mem. at 9. Further, plaintiffs have submitted a declaration from a member who uses areas near the BAN and CW lease tracts and has concrete plans to return, stating that viewing these air pollutants diminishes his aesthetic and recreational enjoyment. *See* Pls.' Mem. at 9-10; Decl. of Jeremy Nichols [Dkt. # 38-5], at ¶¶ 5-8, 10-15; *see Lujan*, 504 U.S. at 564 (environmental plaintiff must show concrete plans to visit affected area in the future in order to show injury in fact). Thus, plaintiffs have shown that some of their members will be injured by the increase in pollution generated by coal mining on the BAN and CW tracts.

Next, plaintiffs can show causation because BLM concedes that development of the two lease tracts will result in increased emissions of certain air pollutants. AR 1713, 1684. To show causation in this procedural injury context, plaintiffs must show two causal links: one between the allegedly deficient EIS and BLM's leasing decision, and one between that leasing decision and plaintiffs' particularized injury. *See West Antelope II*, 738 F.3d at 306 (citing *Fla. Audubon Soc'y*, 94 F.3d at 668). The first link is easily found here because plaintiffs need only "show that the procedural step was connected to the substantive result," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (citation omitted), not that but for the alleged procedural deficiency BLM would have reached a different substantive result, *see West Antelope II*, 738 F.3d at 306. As to the second link, plaintiffs must "demonstrate a causal connection between the agency action and the alleged injury," *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007), and plaintiffs have done so here "because the local pollution that causes their members'

aesthetic and recreational injuries follows inexorably from the decision to authorize leasing" on the BAN and CW tracts. *See West Antelope II*, 738 F.3d at 306.

Finally, plaintiffs meet the low threshold for showing redressability in a procedural injury action because all that is required is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. at 518; *see also West Antelope II*, 738 F.3d at 306 ("Vacatur of the BLM order would redress the Appellants' members' injuries because, if the BLM is required to adequately consider each environmental concern, it could change its mind about authorizing the lease offering."). Therefore, plaintiffs have standing to challenge the alleged deficiencies in the FEIS's consideration of local air quality impacts based on their members' aesthetic and recreational injuries caused by local pollution in areas near the BAN and CW lease tracts. *See West Antelope II*, 738 F.3d at 306.

### B. Plaintiffs Have Standing to Challenge Impacts of BLM's Leasing Decision on Climate Change

Plaintiffs also allege that BLM's FEIS failed to adequately address the impacts of the leasing decisions on climate change. To establish standing to raise this claim, plaintiffs allege that BLM's authorization of the BAN and CW leases will cause harm to the aesthetic, recreational, and economic interests of their members due to climate change. According to plaintiffs, GHG emissions from both mining operations and the future combustion of the mined coal to generate electricity will "exacerbate climate change" by contributing to sea level rise in New Jersey and Florida and deleterious

15

ecosystem changes in the Western United States. Pls.' Mem. at 12-17; Decl. of Michael

C. MacCracken [Dkt. #38-4], at ¶¶ 13, 23, 37, 38, 41.

Plaintiffs advance two arguments to establish their standing with respect to BLM's consideration of climate change impacts. First, relying on our Circuit Court's prior decisions in *Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009) and *Sierra Club v. Adams*, 578 F.2d 389 (D.C. Cir. 1978), they argue for what might be called a form of "derivative" standing. That is, because plaintiffs undisputedly have standing to challenge the adequacy of the FEIS with regard to its analysis of local air quality impacts (as discussed above), they contend that, by extension, they also have standing to challenge *any other* alleged inadequacies in the FEIS—including its analysis of climate change impacts—because all of the alleged inadequacies are part of the same NEPA claim. *See* Pls.' Mem. at 11-12; Pls.' Reply at 2-4. Second, relying in large part on the declaration of climate scientist Dr. Michael MacCracken, plaintiffs argue that their alleged climate change related injuries provide an independent basis for standing under the traditional three-part standing inquiry. Pls.' Mem. at 12-20. Fortunately, however, I need not navigate the troubled waters of the "derivative" standing issue, nor need I decide whether plaintiffs have established a separate injury in fact caused by climate change, because our Circuit Court's discussion of this issue in *West Antelope II* controls my analysis and makes clear that plaintiffs here do, in fact, have standing to challenge the FEIS's consideration of climate change impacts on a procedural injury theory.

In *West Antelope II*, the same conservation organizations that are plaintiffs in this case appealed the District Court's grant of summary judgment in favor of defendants, including its ruling that the plaintiffs did not have standing to argue that BLM's FEIS failed to adequately address the impact of the leasing decision on global climate change. On appeal, our Circuit Court agreed that the appellant conservation organizations did *not* have standing under the three-part standing inquiry based on the effects of global climate change. *West Antelope II*, 738 F.3d at 307. Notwithstanding that conclusion, however, the Court went on to hold that appellants' injury in fact resulting from local pollution sufficed to give them standing to challenge *each* of the alleged deficiencies in the FEIS, *including* the FEIS's allegedly inadequate analysis of the impacts of the leasing decisions on global climate change, "because each [alleged inadequacy] constitutes a procedural injury connected to their members' recreational and aesthetic injuries: Their members' injuries are caused by the allegedly unlawful ROD and would be redressed by vacatur of the ROD on the basis of any of the procedural defects identified in the FEIS." *Id.* at 308; *see also id.* at 307 ("The Appellants' aesthetic injury follows from an inadequate FEIS whether or not the inadequacy concerns the same environmental issue that causes their injury. If we vacate the BLM order, their injury will be redressed regardless whether the FEIS's specific flaw relates to local or global environmental impacts; either way, the remedy is 'limited to the inadequacy'—here, a deficient FEIS—'that produced the injury in fact that the plaintiff has established.'" (citation omitted)).[9]

---

[9] In reaching this holding, our Circuit Court declined to rely on its prior decision in *Adams*—in which it held that where plaintiffs had established standing to challenge the adequacy of an EIS

So too here. Plaintiffs in the instant case, just like appellants in *West Antelope II*, have established standing on a procedural injury theory to challenge BLM's analysis of local air quality impacts, based on the harm to plaintiffs' members' concrete aesthetic and recreational interests caused by local pollution that follows from the leasing decisions. *See id.* at 306. And since our Circuit Court expressly declined to adopt a requirement "that the specific type of pollution causing the Appellants' aesthetic injury—here, local pollution—be the same type that [plaintiffs allege] was inadequately considered in the FEIS," *id.* at 307, then plaintiffs here also "may challenge each of the alleged inadequacies in the FEIS" because "[t]heir members' injuries are caused by the allegedly unlawful ROD and would be redressed by vacatur of the ROD on the basis of any of the procedural defects identified in the FEIS," *see id.* at 308. Accordingly, plaintiffs also have standing to challenge the alleged deficiencies in BLM's FEIS relating to its consideration of climate change impacts.

## II.   The Merits

In assessing the merits of plaintiffs' NEPA and FLPMA claims, this Court must apply the APA's arbitrary and capricious standard of review. *West Antelope II*, 738 F.3d at 308; 5 U.S.C. § 706(2)(A). In the specific context of an agency's preparation of an EIS pursuant to NEPA, our Circuit Court has described this deferential standard as a "rule of reason" standard. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190,

---

on at least one ground, they could also raise other inadequacies in the EIS based on "the 'public interest' in requiring government officials to discharge faithfully their statutory duties under NEPA," *Adams*, 578 F.2d at 392—and expressed "no opinion" on the continuing validity of the "public interest" rationale in light of intervening Supreme Court precedent. *West Antelope II*, 738 F.3d at 307-08.

195-96 (D.C. Cir. 1991). If the agency's decision is "fully informed and well-considered, it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment." *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 736 (D.C. Cir. 2000) (internal quotation marks and citation omitted). Put differently, the Court's role "is not to 'flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor.'" *West Antelope II*, 738 F.3d at 308 (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)). Instead, it is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious," *id.* (citations and quotation marks omitted)—that is, to ensure that the agency took the required "'hard look' at the environmental effects of its proposed action," *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011). *See also New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) ("NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978))).

Plaintiffs in this case have raised several challenges to the sufficiency of the FEIS, but plaintiffs' complaint, at bottom, is that BLM did not analyze certain issues in the manner or level of detail plaintiffs would have preferred, and therefore this Court should vacate the FEIS. Unfortunately for plaintiffs, the applicable standard of review neither contemplates nor countenances that type of judicial second-guessing of agency decisionmaking, and therefore I find that plaintiffs' claims are without merit.

### A.    Plaintiffs' NEPA Claims Are Without Merit

Under NEPA, an EIS must examine the proposed project's direct, indirect, and cumulative impacts, as well as alternatives to the proposed project. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.16, 1508.25. Direct impacts "are caused by the action and occur at the same time and place," 40 C.F.R. § 1508.8(a), whereas indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," 40 C.F.R. § 1508.8(b). And in doing a cumulative impact analysis, the agency "must assess the impact the proposed project will have in conjunction with other projects in the same and surrounding areas . . . and must include past, present, and reasonably foreseeable future actions of any agency or person." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010); 40 C.F.R. § 1508.7.

In this case, plaintiffs allege that the FEIS prepared by BLM violated NEPA for three reasons. First, they claim that BLM failed to take the required "hard look" at the local air quality impacts from coal mining on the leases. Compl. ¶¶ 75-76, 79-82; Pls.' Mem. at 22-30. Second, they claim that BLM failed to take a "hard look" at the climate change impacts of GHG emissions, including $CO_2$, resulting from lease development— i.e. both the mining of the coal itself, and the eventual combustion of the mined coal. Compl. ¶¶ 75-77; Pls.' Mem. at 30-39. And third, plaintiffs claim that BLM failed to consider "reasonable alternatives" to prevent or minimize GHG emissions, to include mitigation measures. Compl. ¶¶ 78-82; Pls.' Mem. at 40-42. Addressing each in turn, I

conclude for the following reasons that BLM did, indeed, consider all of the relevant factors and did *not* commit a clear error of judgment.

### 1. BLM Adequately Discussed and Analyzed Impacts on Local Air Quality

Plaintiffs first claim that BLM failed to take the required "hard look" at the local air quality impacts from coal mining on the leases in two respects—the direct and cumulative impacts to air quality of ozone emissions from coal mining, and the direct impacts of particulate matter ($PM_{10}$) emissions. Compl. ¶¶ 75-76, 79-82; Pls.' Mem. at 22-30.

### a) BLM Adequately Discussed and Analyzed Ozone Impacts on Air Quality

Plaintiffs argue that BLM inadequately discussed and analyzed the direct and cumulative impacts of ozone emissions on local air quality. Compl. ¶ 58; Pls.' Mem. at 22-25. Plaintiffs emphasize that the FEIS did not include a specific analysis of the direct impacts of ozone that will result from lease development, and they claim that the agency "simply provided a table of ozone levels from 2001 through 2008 and did no more." Pls.' Mem. at 23. Further, in an effort to steer this Court away from reaching the same conclusion as my colleague did in *West Antelope I* that BLM's ozone analysis complied with NEPA, plaintiffs argue that the court's discussion of ozone in that case was flawed because its reliance on BLM's finding that the area was in "attainment" for ozone NAAQS improperly conflated the agency's obligation to analyze the "affected environment" with its separate obligation to analyze the "environmental consequences"

of the proposed action. Pls.' Mem. at 23. *Compare* 40 C.F.R. § 1502.15 (affected

environment), *with* 40 C.F.R. § 1502.16 (environmental consequences). Plaintiffs'

arguments, however, are not only unpersuasive, but they fail to withstand scrutiny under

our Circuit Court's analysis of this very issue of ozone impacts in its *West Antelope II*

opinion.

In the FEIS for the South Gillette area lease tracts, including the BAN and CW

tracts, BLM discussed ozone in multiple places, *see* AR 1506, 1682-84, 1713-18; Def.'s

Mot at 22-23, and the agency's analysis demonstrates the required "hard look." First, the

FEIS explained that ground level ozone ("$O_3$") is a pollutant formed when nitrogen

oxides ("$NO_X$") emissions and volatile organic compounds react with sunlight. AR 1684.

In other words, mining operations produce $NO_X$ emissions but not ozone itself, *see* AR

1716, and thus BLM noted that it was including ozone in its discussion of $NO_X$ emissions

because $NO_X$ is one of the main precursors to the formation of ground-level ozone, AR

1713. The FEIS then identified background concentrations of ozone at 132 $\mu/m^3$ for past

years 2005-2008 and found that they were within the "attainment" status of 147 $\mu/m^3$ set

by the applicable NAAQS. AR 1683.[10] Next, the FEIS looked to the future and, based

on long-term modeling, estimated that "currently projected mine activities will be in

compliance with the annual $NO_X$ [air quality standards]" for the life spans of both the

Belle Ayr and Caballo mines. AR 1717-18; Def.'s Mem. at 23. Moreover, BLM

identified and discussed the environmental consequences of $NO_X$ emissions, as well as

---

[10] While the EPA has established NAAQS for ozone and nitrogen dioxide ("$NO_2$"), a type of
$NO_X$, there is no NAAQS standard for $NO_X$. *See West Antelope II*, 738 F.3d at 311.

the health risks associated with the inhalation of both ground-level ozone and $NO_X$. AR 1719-20.

Not surprisingly, plaintiffs take issue with this mode of analysis, arguing that BLM's discussion of the ozone precursor, $NO_X$, was inadequate because $NO_X$ "cannot serve as a proxy for ozone concentration" since there are no established NAAQS for $NO_x$ and it is measured in different units. Pls.' Mem. at 24. But plaintiffs' argument that "analysis of $NO_X$ emissions is not equivalent to an analysis of ozone emissions," Pls.' Mem. at 24, falls well short of showing that the agency failed to consider relevant factors and make appropriate disclosures. Indeed, plaintiffs' argument on this point is specifically foreclosed by our Circuit Court's decision in *West Antelope II*, which affirmed the adequacy of BLM's ozone analysis for nearby lease tracts using precisely the same method of analysis. *See West Antelope II*, 738 F.3d at 311-12 (confirming "the appropriateness of the BLM's use of $NO_X$ as a proxy for ozone" and observing, "[i]t may have been possible or even prudent for the BLM to separately model future ozone levels but we think that, given the limitations on such modeling and the critical role $NO_X$ plays in ozone formation, the BLM's projections and extensive discussion of $NO_X$ and $NO_2$ emissions suffice.").

Indeed, I think BLM's decision to address ozone in its analysis of $NO_X$ emissions, rather than devote an exclusive section of the FEIS to ozone, was particularly reasonable in light of the fact that mining activities emit $NO_X$, *not* ozone itself—which is only formed subsequently when $NO_X$ reacts with other compounds in the presence of sunlight, making ozone forecasting imprecise. *See* Def.'s Mem. at 24. Though plaintiffs suggest

that BLM could have considered ozone modeling performed by the Western Regional Air Partnership, *see* Pls.' Reply at 19-20, such a complaint is a far cry from showing that the agency failed to consider ozone at all, and under the "rule of reason" standard, such detailed second-guessing of an agency's choices is not the proper role of this Court. *See West Antelope I*, 880 F. Supp. 2d at 88 ("'It is of course always possible to explore a subject more deeply and to discuss it more thoroughly,' but '[t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.'" (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir.1987))).

In sum, BLM made the reasonable choice to address ozone in its $NO_X$ discussions because $NO_X$ can serve as a "proxy" for ozone, *see* AR 1506, 1682, 1684, and it is hard to see why further analysis would be necessary given that the FEIS demonstrated that past ozone concentrations were within the "attainment" status of the applicable NAAQS and modeling projected future compliance with air quality standards. Much like Judge Kollar-Kotelly in *West Antelope I* (and as affirmed by our Circuit Court), I see no reason to require BLM to perform a more detailed analysis of ozone.

### b) BLM Adequately Discussed and Analyzed Particulate Matter Impacts on Air Quality

Next, plaintiffs contend that BLM also failed to take the requisite "hard look" at the direct air quality impacts of $PM_{10}$ emissions from development of the BAN and CW tracts. Compl. ¶ 79; Pls.' Mem. at 26-30. Plaintiffs emphasize that the FEIS does not consider whether the $PM_{10}$ emission levels from mining activities would approach or

exceed the 24-hour NAAQS standard, or the extent to which these emissions would degrade short-term air quality. *Id.*

Again, however, the record reflects that BLM performed adequate analysis of $PM_{10}$ direct impacts on air quality. In the FEIS, the agency discussed the sources of $PM_{10}$ pollution, the applicable air quality standards (both 24-hour and annual), natural background concentrations of $PM_{10}$ in the region, and the health impacts of $PM_{10}$. AR 1681-1692; Def.'s Reply at 9. In particular, BLM examined historic concentrations of $PM_{10}$ in the area and noted that both 24-hour and annual concentrations were below applicable standards and thus in "attainment" status; found that no exceedances of either the 24-hour or annual standards had occurred at the Belle Ayr or Caballo mines; and disclosed exceedances that had occurred at other mines outside the South Gillette area in the years 2001-2007. Def.'s Mem. at 25-26; AR 1500-01, 1685, 1691-92, 2290-91. Regarding future estimates, BLM explained that the rate of mining operations at the BAN and CW tracts would be similar to those at the existing mines, AR 1685, and, using long-term modeling based on that assumption, predicted that no exceedances of the annual $PM_{10}$ standard would occur at either the BAN or CW tracts. Def.'s Mem. at 26; AR 1500-01, 1691-92, 2290-92. Based on this past data and future estimates, BLM concluded that $PM_{10}$ emissions resulting from the two leases could be expected to remain within applicable NAAQS standards. AR 1693, 1702.

The crux of plaintiffs' complaint, then, is that BLM used *annual* modeling to predict short-term (24-hour) levels of $PM_{10}$, and therefore BLM's analysis adequately considered cumulative impacts but not *direct* (i.e. 24-hour) impacts. Pls.' Mem. at 27.

But the agency candidly disclosed that no appropriate model exists to accurately predict 24-hour impacts, and thus it instead relied on available modeling data showing compliance with applicable air quality standards on an annual basis. AR 1691; Def.'s Reply at 9-10.[11] In light of past data, expected mining activity on the two leases, and available modeling estimates, it was reasonable for BLM to conclude that $PM_{10}$ concentrations could be expected not to exceed 24-hour or annual air quality standards. Plaintiffs essentially demand a better, more detailed model for 24-hour $PM_{10}$ emissions, but this is a far cry from showing that BLM utterly failed to consider a "relevant factor." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Accordingly, BLM's analysis complies with the "rule of reason" in light of the information available to the agency, and is sufficiently thorough to comply with NEPA.

### 2. BLM Adequately Discussed and Analyzed Climate Change Impacts

Plaintiffs next argue that BLM failed to take a "hard look" at the climate change impacts of GHG emissions, including $CO_2$, resulting from lease development—i.e. both the mining of the coal itself, and the eventual combustion of the mined coal. Compl. ¶¶ 75-77; Pls.' Mem. at 30-39. Specifically, plaintiffs allege that BLM's analysis was inadequate in three ways. First, they contend that BLM failed to analyze direct impacts to climate from $CO_2$ emissions from coal mining on the two leases. Second, they contend that BLM failed to analyze cumulative impacts to climate resulting from coal mining on

---

[11] In the FEIS, BLM disclosed that short-term, 24-hour modeling did predict some exceedances for the larger PRB area, but also noted that such short-term modeling is not reliable because it over-predicts 24-hour concentrations of $PM_{10}$. AR 1966, 1691-92.

the two leases in combination with coal mining on ten other federal leases in the PRB. And third, they contend that BLM failed to analyze the indirect impacts to climate resulting from the combustion of coal mined from the two leases in combination with that mined from the ten other federal leases in the PRB. *See* Pls.' Mem. at 30. I disagree and find that BLM's analysis adequately considered climate change and the reasonably foreseeable impacts of its leasing decisions; the level of specificity plaintiffs would prefer in BLM's analysis is neither possible based on current science, nor required by law.

BLM's FEIS examined climate change in two places, Chapter 3 ("Affected Environment and Environmental Consequences") and Chapter 4 ("Cumulative Environmental Consequences"). BLM discussed the role of GHG emissions in climate change and the greenhouse effect. AR 1920. Moreover, BLM acknowledged that GHGs will be released during coal mining operations, provided annual data on GHG emissions at the South Gillette area mines in 2007, and then estimated expected annual GHG emissions that would likely result from coal mining operations at those mines with the new lease tracts. AR 1922. Specifically, BLM estimated that coal mining at the South Gillette area mines, including the four proposed leases (which include the two leases challenged here) would collectively emit 1.182 million metric tons of $CO_2$ annually, representing 1.7 percent of the projected 2020 state-wide emissions for Wyoming, *see* AR 1922; Pls.' Mem. at 32, and that such South Gillette area coal mining, in combination with coal mining at other PRB mines and with other pending leases, would emit 4.229 million metric tons annually, *see* AR 2042. The EIS then acknowledged that although "use of the coal after it is mined is . . . not determined at the time of leasing . . . almost all

27

of the coal that is currently being mined in the Wyoming PRB is being used by coal-fired power plants to generate electricity," AR 2032, and thus went on to discuss emissions and by-products of coal combustion, AR 2046, as well as estimate the $CO_2$ emissions resulting from coal combustion from all PRB mines for the year 2006 at 716.9 million metric tons, or 33.6 percent of all estimated $CO_2$ emissions from coal combustion in the United States. AR 2041. Finally, BLM discussed studies that recognized global warming and potential impacts of climate change in the Western United States, AR 2034-38, but specifically noted that "there are uncertainties regarding how climate change may affect different regions," AR 2036.

Plaintiffs take issue with this level of detail in BLM's analysis, arguing that the FEIS failed to sufficiently analyze the climate impacts of GHG emissions from mining operations on the leases and subsequent combustion of the mined coal. *See* Pls.' Mem. at 30-39. In plaintiffs' view, "estimates [of GHG emissions] alone without an analysis of the impacts to climate resulting from these emission levels do not comply with NEPA's hard look requirement." Pls.' Mem. at 32. But it is precisely because current climate science is uncertain (and does not allow for specific linkage between particular GHG emissions and particular climate impacts) that evaluating GHG emissions as a percentage of state-wide and nation-wide emissions, as BLM did here, is a permissible and adequate approach. *See West Antelope II*, 738 F.3d at 309; *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011) (because "the effect of [GHGs] on climate is a *global* problem[,] a discussion in terms of percentages is therefore adequate for [GHG] effects," and the agency's analysis of GHGs need not be specific to the locale).

Indeed, as our Circuit Court held in *West Antelope II*, "[b]ecause current science does not allow for the specificity demanded by the Appellants, the BLM was not required to identify specific effects on the climate in order to prepare an adequate EIS." *West Antelope II*, 738 F.3d at 309; *see also id.* (citing draft guidance from the Council on Environmental Quality that notes "it is not currently useful for the NEPA analysis to attempt to link specific climatological changes, or the environmental impacts thereof, to the particular project or emissions, as such direct linkage is difficult to isolate and to understand. The estimated level of GHG emissions can serve as a reasonable proxy for assessing potential climate change impacts . . ."). Accordingly, the FEIS's discussion of climate impacts was adequate here.

### 3. BLM Considered a Reasonable Range of Alternatives

In addition to requiring a "hard look" at environmental impacts, NEPA also requires federal agencies to include in an EIS "a detailed statement... [of] alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); *Transmission Access Policy Study Grp.*, 225 F.3d at 735. The agency "bears the responsibility for deciding which alternatives to consider in an [EIS]," and when reviewing the agency's consideration of alternatives, this Court must, again, apply the "rule of reason" standard. *Citizens Against Burlington, Inc.*, 938 F.2d at 195; *id.* ("this rule of reason governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them" (internal quotation marks and citation omitted)). Here, plaintiffs urge this Court to find BLM's FEIS deficient because it failed to consider the alternatives that plaintiffs proposed to address GHG emissions and climate change—requiring emissions capture and sequestration,

more efficient mine hauling trucks, and carbon offsets for the leases.  Pls.' Mem. at 40-41; AR 4255-56.  Unfortunately for plaintiffs, however, I find that under the "rule of reason" standard BLM considered a reasonable range alternatives and was not required to specifically consider plaintiffs' proposed measures.

NEPA requires only that an agency consider alternatives that are feasible or reasonable.  *Citizens Against Burlington, Inc.*, 938 F.2d at 195 (citing 40 C.F.R. §§ 1502.14(a)-(c), 1508.25(b)(2)).  The agency is responsible for deciding which alternatives to consider in an EIS, and its selection of them, as well as the extent to which it discusses them, need only be reasonable in relation to the objective or purpose of the planned action.  *See id.* at 195-96.  In other words, an agency's consideration of alternatives is not legally inadequate "simply because the agency failed to include every alternative device and thought conceivable by the mind of man."  *Vt. Yankee*, 435 U.S. at 551.

In this case, BLM prepared an EIS in response to LBA applications it received.  In that context, BLM's objective and purpose was to act upon the applications.  *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73-74.  Its options were necessarily limited to: (1) holding competitive sealed-bid lease sales for the tracts as applied for, (2) holding such sales for modified tracts, or (3) rejecting the applications and not offering the tracts for lease.  AR 1568; *see also* 43 C.F.R. §§ 3425.1-9, 3425.1-8.  And in making a decision on the applications, BLM had to account for "the needs and goals of the parties involved in the application" as well as "the views of Congress . . . [as expressed] in the agency's statutory authorization to act, as well as in other congressional directives."  *Citizens Against Burlington, Inc.*, 938 F.2d at 196.  Here, BLM considered the objectives

of the applicants to secure "access to a continuing supply of low sulfur compliance coal which would be mined and sold to power plants for the purpose of electric power generation." AR 1569. The agency also considered its own role of administering the federal coal leasing program under the MLA, which "encourages the development of domestic coal reserves and reduction of the U.S. dependence on foreign sources of energy," as well as considered the national goals to "add energy supplies from diverse sources" per the National Energy Policy, "meet the nation's future energy needs" by continued coal extraction, and help "provide a stable supply of power to meet increasing demand without a potentially significant increase in power costs." AR 1568-70.

In light of these factors, BLM's consideration of alternatives in the FEIS, including a "No Action" option, under which the tracts would not be leased, AR 1580-1622, was sufficient under the "rule of reason" standard. First, BLM was not required to consider plaintiffs' proposals simply because they raised them in public comments on the FEIS. Put simply, an agency need not adjust course for every comment received at any stage in the process of taking an action, especially where, as here, those comments were submitted late in the proceedings at the FEIS stage. *See* Def.'s Mem. at 31-32; *West Antelope II*, 738 F.3d at 310-11 (rejecting plaintiffs' argument that BLM failed to analyze a reasonable range of alternatives to address GHG emissions and climate change when BLM did not consider a list of alternatives proposed by plaintiffs, noting that plaintiffs' submission of such alternatives at the FEIS stage (rather than the scoping or draft EIS stage) was "sandbagging," and "the last-ditch, kitchen-sink nature of WildEarth's suggestions bears on the extent to which the BLM was required to address them"); *see*

*also Vt. Yankee,* 435 U.S. at 553-54 ("administrative proceedings should not be a game or a forum to engage in unjustified obstructionism . . ."). To the contrary, the agency is responsible for deciding which alternatives to consider in an EIS. *Citizens Against Burlington, Inc.*, 938 F.2d at 195-96.

Second, and more importantly, BLM considered a full range of alternatives, including an option not to lease the tracts at all, and in doing so evaluated the potential environmental impacts of each. Plaintiffs' specific proposals about measures to reduce GHG emissions once mining of the tracts commences, therefore, do not represent some broad category of "reasonable but unexamined alternatives" the FEIS should have addressed. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998). Instead, they are more aptly categorized as mitigation measures relevant to the later mining and combustion of coal and associated permitting by other agencies, rather than to the leasing itself. *See West Antelope II*, 738 F.3d at 311. Indeed, NEPA does *not* require BLM to include in its FEIS "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action." *Robertson*, 490 U.S. at 353 (internal quotation marks and citation omitted). In sum, I find that BLM's consideration of alternatives was adequate under the "rule of reason."

**B.    Plaintiffs' FLPMA Claims Are Without Merit**

Finally, plaintiffs claim that BLM violated FLPMA by failing to ensure that its leasing decisions would result in compliance with federal air quality standards. *See* Compl. ¶¶ 83-92. However, plaintiffs point to no legal authority supporting their assertion of a legal "duty" BLM owes to ensure compliance, and therefore these claims must also fail.

FLPMA requires the Secretary of the Interior to "manage the public lands . . . in accordance with the land use plans," 43 U.S.C. § 1732(a), and land use plans must "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans," *id.* § 1712(c)(8). Pointing to the Buffalo RMP, the land use plan that covers the PRB, plaintiffs argue that BLM has violated its legal duties under FLPMA by (1) failing to do "the requisite analysis" to determine whether its lease authorizations will comply with ozone NAAQS, and (2) authorizing the leases while "knowing" that $PM_{10}$ emissions from mining the lease tracts "will result in exceedances of the 24-hour $PM_{10}$ NAAQS." Pls.' Mem. at 43-44; Compl. ¶¶ 89, 91. I disagree.

Not only are these claims "duplicative" of plaintiffs' NEPA claims, *see West Antelope I*, 880 F. Supp. 2d at 94, but plaintiffs supply no legal authority for their assertion that BLM has a "legal obligation to impose concrete emission-reduction measures" on the leases, Pls.' Mem. at 44, or a "substantive duty under FLPMA to follow the dictates of the RMP, rather than passing its responsibility on" to the lessee and the Wyoming state regulatory body, Pls.' Mem. at 45. To the contrary—and as my

colleague noted in *West Antelope I* regarding an identical claim by these plaintiffs—

"neither the FLPMA nor the implementing regulations required BLM to analyze whether and to what degree the leasing of the . . . tracts would comply with national ozone, $PM_{10}$, and $NO_2$ standards." *West Antelope I* at 94. Instead, applicable regulations require only that BLM draft land use authorizations, including leases, such that they "[r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law. 43 C.F.R. § 2920.7(b)(3). BLM has done exactly that by including clauses in the BAN and CW leases requiring compliance with air and water quality standards. AR 2149. Accordingly, plaintiffs' FLPMA claims are without merit.

## CONCLUSION

Thus, for all of the foregoing reasons, the Court DENIES plaintiffs' Motion for Summary Judgment, GRANTS defendant's Cross-Motion for Summary Judgment, and GRANTS defendant-intervenors' Cross-Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD L. LEON
United States District Judge